James P. Roberts
Scott H. Palmer
Breanta Boss
**PALMER PERLSTEIN**
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
james@palmerperlstein.com
scott@palmerpelrstein.com
breanta@palmerperlstein.com

Benjamin L. Crump, Esq.
**Benjamin Crump Law, PLLC**
717 D Street NW, Suite 310
Washington, D.C. 20004
850.224.2020
Ben@bencrump.com

COUNSEL FOR PLAINTIFFS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| **MONTE HANDY, Individually, and as Personal Representative of the ESTATE OF KRISTOPHER HANDY, On Behalf of the Estate and All Surviving Statutory Beneficiaries, ARDELL HANDY, Individually, and CACY GOULD, as next friend of, I.H., a Minor, A.H., a Minor, and M.H, a Minor,** | ) ) ) ) ) ) ) ) ) ) | |
| *Plaintiffs*, | ) ) | |
| **v.** | ) ) | |
| **JACOB JONES, JACOB OSTOLAZA, NOEL SENORAN, and JAMES STINEMAN,** | ) ) ) ) ) | |
| *Defendants*. | ) ) | **Case No.** |

## ORIGINAL COMPLAINT

1

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, Plaintiff MONTE HANDY, Individually, and as Personal Representative of the ESTATE OF KRISTOPHER HANDY, on behalf of the Estate and All Surviving Statutory Beneficiaries, ARDELL HANDY, Individually, and CACY GOULD, as next friend of, I.H., a Minor, A.H., a Minor, and M.H, a Minor, by and through their counsel, and hereby state the following in support of their Original Complaint for the death of their son and father, respectively:

> "Law enforcement officials may not kill suspects who do not pose an immediate threat to their safety or to the safety of others simply because they are armed."

*George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013).

## SUMMARY

On May 13, 2024, Anchorage Police Officers Jacob Jones, Jacob Ostolaza, Noel Senoran, and James Stineman shot and killed Kristopher Handy ("Kris") as Kris was stepping down from a curb and holding a shotgun in his right hand that was dangling straight down at his side and pointed directly down at the ground. Despite the Anchorage Police Department ("APD") issuing a statement that officers shot Kris due to Kris raising his gun at them, ALL VIDEO FOOTAGE conclusively proves that Kris never pointed or raised the gun at officers or any other person. Ninth Circuit and Supreme Court caselaw is clear that simply holding a firearm is not justification for the use of deadly force.

The below screenshot from dash camera video – at the moment just before Kris was shot – shows Kris' gun dangling at his side, not being pointed or raised in the direction of any person. Kris' right arm is hanging straight down at his side – clearly not raising or pointing the gun at anyone. The gun is identified using a yellow arrow.

2



Virginia Miller, a neighbor in the complex, stated in a news interview, "I never saw him raise the gun, I never saw him charge at the officers, and I never felt like any of us were in imminent danger until the officers started shooting toward our full apartment building." Miller stated the police wasted no time in shooting, stating, "I believe that they [the police] should have done more to assess the situation before spending a minute here and deciding to call him out and shoot him." Miller's doorbell camera captured the shooting from behind Kris. A screenshot of that video – at the moment before Kris was shot – is below, which shows Kris' gun, identified using a yellow arrow and shadow cicle, dangling down at his side and not being pointed or raised.



3

APD averages three police shootings a year. However, in less than three months, APD officers shot five people, killing three – including Kris. Shockingly, Defendant Jones was involved in two of these shootings – including killing Kris in this case.

Plaintiffs now files this lawsuit on behalf of the Estate of Kristopher Handy and on behalf of all surviving statutory beneficiaries of Kristopher Handy, for the wrongful death of their son and father and for violating Kristopher's constitutional rights under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures, by way of excessive deadly force. Plaintiffs also sue for due process violations of their right to familial association.

## I.
## PARTIES

1.      Plaintiff Monte Handy is the father of Kristopher Handy and the personal representative of the Estate of Kristopher Handy and is authorized to bring this Complaint to seek redress for the injuries and damages sustained as a result of the conduct alleged in this complaint. Plaintiff Monte Handy brings these claims on behalf of the Estate of Kristopher Handy and on behalf of all surviving statutory beneficiaries. Plaintiff Monte Handy also brings a claim for the loss of companionship and society of his child.

2.      Plaintiff Ardell Handy is mother of Kristopher Handy and is authorized to bring this Complaint to seek redress for the injuries and damages sustained as a result of the conduct alleged in this complaint.

3.      Plaintiff Cacy Gould is the mother of I.H., a Minor child, and brings claims on behalf of I.H., a Minor child, as next friend. Plaintiff is authorized to bring this Complaint to seek redress for the injuries and damages sustained as a result of the conduct alleged in this complaint.

4

4.      Plaintiff Cacy Gould is the mother of A.H., a Minor child, and brings claims on behalf of A.H., a Minor child, as next friend. Plaintiff is authorized to bring this Complaint to seek redress for the injuries and damages sustained as a result of the conduct alleged in this complaint.

5.      Plaintiff Cacy Gould is the mother of M.H., a Minor child, and brings claims on behalf of M.H., a Minor child, as next friend. Plaintiff is authorized to bring this Complaint to seek redress for the injuries and damages sustained as a result of the conduct alleged in this complaint.

6.      Defendant Jacob Jones is an individual residing in this judicial district. At all times relevant hereto, Defendant Jacob Jones was a police officer with the Anchorage Police Department, an employee of the City of Anchorage, and was acting within the course and scope of his employment. All acts committed by Defendant Jacob Jones were done under color of the laws of the State of Alaska and under the authority of his position as a police officer with the Anchorage Police Department. Defendant Jacob Jones is being sued in his individual capacity. Defendant Jones can be served at the Anchorage Police Department or wherever he may be found.

7.      Defendant Jacob Ostolaza is an individual residing in this judicial district. At all times relevant hereto, Defendant Jacob Ostolaza was a police officer with the Anchorage Police Department, an employee of the City of Anchorage, and was acting within the course and scope of his employment. All acts committed by Defendant Jacob Ostolaza were done under color of the laws of the State of Alaska and under the authority of his position as a police officer with the Anchorage Police Department. Defendant Jacob Ostolaza is being sued in his individual capacity. Defendant Ostolaza can be served at the Anchorage Police Department or wherever he may be found.

8.      Defendant Noel Senoran is an individual residing in this judicial district. At all times relevant hereto, Defendant Noel Senoran was a police officer with the Anchorage Police

5

Department, an employee of the City of Anchorage, and was acting within the course and scope of his employment. All acts committed by Defendant Noel Senoran were done under color of the laws of the State of Alaska and under the authority of his position as a police officer with the Anchorage Police Department. Defendant Noel Senoran is being sued in his individual capacity. Defendant Senoran can be served at the Anchorage Police Department or wherever he may be found.

9. Defendant James Stineman is an individual residing in this judicial district. At all times relevant hereto, Defendant James Stineman was a police officer with the Anchorage Police Department, an employee of the City of Anchorage, and was acting within the course and scope of his employment. All acts committed by Defendant James Stineman were done under color of the laws of the State of Alaska and under the authority of his position as a police officer with the Anchorage Police Department. Defendant James Stineman is being sued in his individual capacity. Defendant Stineman can be served at the Anchorage Police Department or wherever he may be found.

## II.
## JURISDICTION AND VENUE

10. The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiffs are suing for relief under 42 U.S.C. § 1983.

11. Venue is proper in the District of Alaska pursuant to 28 U.S.C. § 1391 because the Defendants are domiciled and/or reside in the District of Alaska, and all or a substantial part of the causes of action accrued in the District of Alaska.

**III.**
**FACTS AND ALLEGATIONS**

12.     In the early morning hours of May 13, 2024, Defendants Jacob Jones, Jacob Ostolaza, Noel Senoran, and James Stineman – all officers with the Anchorage Police Department, shot and killed Plaintiff Kristopher Handy ("Kris") despite Kris not posing a threat to any person as the shotgun he was holding in one hand was pointed directly down at the ground and he made no movements to indicate he was going to use the gun.

13.     Accordingly, each of Defendants Jones, Ostolaza, Senoran, and Stineman shot and killed Kris without legal reason or justification in violation of his Fourth Amendment right to be free from unreasonable seizures by the way of excessive deadly force.

14.     The Defendants were dispatched to an apartment complex on Bearfoot Drive in Anchorage, Alaska after a neighbor called to report a disturbance in Kris' apartment between Kris and his girlfriend. The neighbor also stated that she saw Kris outside of the apartment and that he was holding either a shotgun or a baseball bat.

15.     Multiple police officers arrived to the location – including officers Aaron Barker, Duston Boynton, Brice Harvey, Mason Norman, Christopher Worland, and Defendants Jones, Ostolaza, Senoran, and Stineman.

16.     Using a loudspeaker, Officer Boynton announced the police presence and directed Kris to come out of the apartment.

17.     Officer Boynton announced over his loudspeaker that the officers had a canine – indicating they would release a dog to bite Kris if he did not comply with orders.

18.     However, at no point did the officers warn of using deadly force.

19.     Kris complied with the order to come out of his apartment by walking out of the door, down the sidewalk in the complex, and to the parking lot.

7

20.     While walking through the complex, Kris raised his shotgun into the air so that the officers could see he had a gun with him.

21.     When Kris raised the shotgun into the air, he did so by holding the gun straight up into the air so that the barrel was pointed at the sky – not at any of the officers or other persons.

22.     This was not a threatening action as he did not point the gun at anyone.

23.     Kris was walking at a casual pace and was not "charging" toward anyone.

24.     Upon information and belief, Kris was simply making it known that he had a gun so the police would not be startled by seeing it later when he stepped down into the street.

25.     Kris then stepped down off the curb into the parking lot.

26.     The barrel of Kris' gun was pointed straight down toward the ground.

27.     The below screenshot from dash camera video shows Kris' gun, identified using a yellow arrow, dangling at his side and not being pointed or raised in the direction of any person.



28.     Kris' right arm is hanging straight down at his side and is not being bent or raised up as he stepped down off the curb.

29.     Kris was not presenting a threat – as he was not pointing or raising the gun but was instead complying with the order to come out of the apartment and was walking at a casual pace toward the officers – who were standing at a distance behind a police vehicle.

30.     Then, without warning, Defendants Jones, Ostolaza, Senoran, and Stineman shot and killed Kris.

31.     The below screenshot from dash camera video shows the moment Defendants Jones, Ostolaza, Senoran, and Stineman began to shoot Kris as he grimaces in pain from being struck by a bullet. Kris' gun can be seen dangling at his side, not being pointed or raised in the direction of any person – just as it was in the moments prior to when Defendants Jones, Ostolaza, Senoran, and Stineman each shot Kris. Once again, the gun is identified using a yellow arrow.



32.     Defendants Jones, Ostolaza, Senoran, and Stineman jointly shot Kris ten times.

33.     Disturbingly, after Kris had been incapacitated on the ground, and shots had stopped being fired, <u>a separate and final lone shot was fired by one of Defendants Jones, Ostolaza, Senoran, and Stineman striking Kris</u>, despite him being immobilized on the ground and clearly not presenting a threat.

9

34.    Kris died on the scene.

35.    Officer Barker approached Kris from his position and reported that he could see Kris was bleeding from the upper body and that Kris' body was moving.

36.    Officer Worland also noted that after Kris went to the ground from being shot, his body was moving.

37.    It should be noted that none of Officers Barker, Boynton, Harvey, Norman, or Worland fired their weapons at Kris.

38.    Importantly, following this shooting, Officer Boynton said that he had his patrol rifle facing front and forward through the windshield in case Kris started firing his weapon. However, Officer Boynton did not fire his rifle.

39.    Clearly, Officer Boynton understood that simply holding a firearm is not justification for using deadly force.

40.    Further, Officer Norman's body camera shows that when Kris came into his sight, Officer Norman began to back up while keeping his rifle pointed at Kris, but Officer Norman did not fire either of his weapons.

41.    Clearly, Officer Norman understood that simply holding a firearm is not justification for using deadly force.

42.    Curiously, when asked why the other officers fired their weapons, Sgt. Worland stated, "because they saw the same thing I saw" and went on to describe that he saw Kris start to bring up the shotgun a second time although not up to his shoulder. Sgt. Worland said as Kris was bringing the gun up again, Sgt. Worland heard gunfire.

43.    This description is similar to the statement that the Anchorage Police Department provided to the public shortly after the shooting, that Kris raised his shotgun at the officers on

scene. However, the body camera and dash camera footage clearly contradict Sgt. Worland's and the Anchorage Police Department's statements that Kris brought the gun up and that it was when he was bringing the gun up that he was shot.

44.     As can be seen from the following screenshot from the dash camera video, at the moment just prior to when Kris was shot, his gun was dangling at his side with his arm straight down and the gun pointing directly down toward the ground below him.



45.     Notably, Virginia Miller, a neighbor in the complex who watched the shooting unfold, stated in a news interview that, "I never saw him raise the gun, I never saw him charge at the officers, and I never felt like any of us were in imminent danger until the officers started shooting toward our full apartment building."

46.     Miller explained that the police wasted no time in shooting, stating, "I believe that they [the police] should have done more to assess the situation before spending a minute here and deciding to call him out and shoot him."

47.     Miller does not think the shooting was justified.

48. Miller's doorbell camera captured the shooting from a viewpoint behind Kris. A screenshot of that doorbell video – at the moment before Kris was shot – is below, which shows Kris' gun dangling at his side, pointed directly at the ground below him, and not being pointed or raised in the direction of any person. The gun is identified using a yellow arrow and shadow circle.



49. Defendant Jones fired his weapon, shooting and killing Kris, <u>despite having his police K-9 with him</u>, which he could have deployed as "less lethal force" (the type of force that Officer Boynton warned Kris of moments earlier) against Kris if he believed force was necessary to restrain Kris.

50. Defendant Jones chose not to release his K-9, but instead to shoot and kill Kris.

51. According to the autopsy, Defendants Jones, Ostolaza, Senoran, and Stineman collectively shot Kris 10 times and grazed him with three other bullets.

52. The doctor who performed the autopsy found that the cause of Kris' death was from multiple gunshot wounds and the manner of death was classified as homicide.

53. All of these gunshot wounds were caused by Defendants Jones, Ostolaza, Senoran, and Stineman each fatally shooting Kris.

54.     Each of Defendants Jones, Ostolaza, Senoran, and Stineman were acting under color of law when they shot and killed Kris, as they were on duty as officers with the Anchorage Police Department, in full uniform, and responding to a call for service.

## IV.
## CAUSES OF ACTION

### Count One

### Use of Excessive Deadly Force
**Violation of the Fourth Amendment Pursuant to 42 U.S.C. § 1983**
**Against Defendants Jacob Jones, Jacob Ostolaza, Noel Senoran, and James Stineman**

55.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

56.     Acting under the color of law, Defendants Jones, Ostolaza, Senoran, and Stineman each deprived Kris of the rights and privileges secured to him by the Fourth Amendment, as applied to the states by the Fourteenth Amendment, to the United States Constitution and by other laws of the United States to be free from illegal and unreasonable seizures by the use of deadly force. Plaintiff brings this cause of action pursuant to 42 U.S.C. § 1983.

57.     The amount of force used by each of Defendants Jones, Ostolaza, Senoran, and Stineman against Kris, as described above, specifically but not limited to, when each of Defendants Jones, Ostolaza, Senoran, and Stineman shot and killed Kris despite Kris not posing a threat of serious physical harm to Defendants Jones, Ostolaza, Senoran, and Stineman, other officers, or other people at the time, was objectively unreasonable under the circumstances and inflicted unnecessary injury, pain, suffering, and death upon Kris and his surviving statutory beneficiaries.

13

58.     A seizure is unreasonable if it results in (a) an injury, (b) that resulted directly and only from a use of force that was clearly excessive, and (c) the excessiveness was clearly unreasonable.

59.     The Ninth Circuit has held that the mere possession of a weapon is not sufficient to justify the use of deadly force, "otherwise, that a person was armed would always end the inquiry." *Est. of Lopez v. Gelhaus*, 149 F. Supp. 3d 1154, 1161 (N.D. Cal. 2016), *aff'd and remanded sub nom. Est. of Lopez by & through Lopez v. Gelhaus*, 871 F.3d 998 (9th Cir. 2017); quoting *Glenn v. Washington County*, 673 F.3d 864, 872 (9th Cir.2011).

60.     Certain principles are clearly established under the cases that implement the fundamental rules regarding the use of deadly force. Law enforcement officers may not shoot to kill unless, at a minimum, the suspect presents an immediate threat to the officer or others or is fleeing and his escape will result in a serious threat of injury to persons. *Harris v. Roderick*, 126 F.3d 1189, 1201 (9th Cir. 1997); *See Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir.1991) (holding that "police officers could not reasonably have believed that the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time").

61.     Kris did not pose a threat of serious physical harm to any officer or other person immediately prior to Defendants Jones, Ostolaza, Senoran, and Stineman shooting him, as Kris did not point his gun at any officer or other person, made no furtive moves or gestures with his gun, did nothing indicating he was going to use his gun against any officers or others, was not quickly charging at the officers (and was not "charging" at all), and did not threaten to shoot or harm the officers or any other person.

62.     Further, Kris was not attempting to flee or escape where the officers could have reasonably believed he posed a serious threat of injury to other persons, as he was casually walking to the parking lot after being ordered to exit his apartment.

63.     Additionally, no warnings were given to Kris that lethal force would be used – instead, a warning was given that the officers would release a K9 to bite him. Instead of releasing the K9, the officers opened fire on Kris, killing him without any sort of notice.

64.     A reasonable officer would know that the use of deadly force is <u>clearly excessive</u> when engaging with suspects such as Kris, who was not threatening any officer or other person and who the use of deadly force was not warranted.

65.     A reasonable officer would know that the use of deadly force is <u>clearly unreasonable</u> when engaging with suspects such as Kris, who was not threatening any officer or other person and who the use of deadly force was not warranted.

66.     A reasonable officer in each of Defendants Jones, Ostolaza, Senoran, and Stineman's shoes would know that shooting a suspect who was holding a gun but had that gun dangling at their side pointed directly down at the ground and was walking in a casual pace after complying with the order to exit his apartment is clearly unreasonable and excessive – especially without any warning of lethal force and after only giving a warning of a K9 bite.

67.     As a direct result of the deadly force used against him by each of Defendants Jones, Ostolaza, Senoran, and Stineman, Kris suffered physical injury, pain, mental anguish, and death for which Plaintiffs sue herein.

68.     As a direct result of the deadly force used against Kris by each of Defendants Jones, Ostolaza, Senoran, and Stineman, Kris's surviving statutory beneficiaries suffered all damages recoverable pursuant to Alaska Stat. Ann. § 09.55.580, for which Plaintiffs sue herein.

69. These injuries were not caused by any other means.

## Count Two

## Due Process Claim for Violation of the Right to Familial Association
**Pursuant to the Fourteenth Amendment**
**Against Defendants Jacob Jones, Jacob Ostolaza, Noel Senoran, and James Stineman**

70. Monte Handy is Kris' father.

71. Ardell Handy is Kris' mother.

72. I.H., a Minor, is Kris' child.

73. A.H., a Minor, is Kris' child.

74. M.H, a Minor, is Kris' child.

75. Here, Monte Handy and Ardell Handy had a Fourteenth Amendment due process right to associate with their son, Kris Handy. *Porter v. Osborn*, 546 F.3d 1131, 1136 (9th Cir. 2008); *See Curnow v. Ridgecrest Police,* 952 F.2d 321, 325 (9th Cir.1991) ("The Ninth Circuit recognizes that a parent has a constitutionally protected liberty interest under the Fourteenth Amendment in the companionship and society of his or her child ...."); *see also Moreland v. Las Vegas Metro. Police Dep't,* 159 F.3d 365, 371 (9th Cir.1998).

76. Additionally, this Circuit has recognized that a child has a constitutionally protected liberty interest under the Fourteenth Amendment in the "companionship and society" of her father. *Hayes v. Cnty. of San Diego*, 736 F.3d 1223, 1229–30 (9th Cir. 2013); *Curnow*, 952 F.2d at 325; *Moreland*, 159 F.3d at 371.

77. Accordingly, I.H., a Minor, A.H., a Minor, and M.H a Minor, each had a Fourteenth Amendment due process right to associate with their father, Kris Handy. *Id*.

78. These rights were clearly established at the time Defendants Jones, Ostolaza, Senoran, Stineman each shot and killed Kris without warning or legal justification. *Porter*, 546

16

F.3d at 1136; *Curnow*, 952 F.2d at 325; *Moreland*, 159 F.3d at 371; *Hayes*, 736 F.3d at 1229–30; *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1075 (9th Cir. 2013) ("Parents and children may assert Fourteenth Amendment substantive due process claims if they are deprived of their liberty interest in the companionship and society of their child or parent through official conduct.").

79.    "Official conduct that 'shocks the conscience' in depriving [a child [or parent]] of that interest is cognizable as a violation of due process." *Hayes*, 736 F.3d at 1230; quoting *Wilkinson v. Torres,* 610 F.3d 546, 554 (9th Cir.2010).

80.    In determining whether excessive force shocks the conscience, the court must first ask "whether the circumstances are such that actual deliberation [by the officer] is practical." *Hayes*, 736 F.3d at 1230; quoting *Porter,* 546 F.3d at 1137; quoting *Moreland,* 159 F.3d at 372 (internal quotation marks omitted)).

81.    Where actual deliberation is practical, then an officer's 'deliberate indifference' may suffice to shock the conscience. On the other hand, where a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may be found to shock the conscience only if he acts with a purpose to harm unrelated to legitimate law enforcement objectives. *Hayes*, 736 F.3d at 1230; *Wilkinson,* 610 F.3d at 554.

82.    Here, each of Defendants Jones, Ostolaza, Senoran, Stineman had time to deliberate on their conduct and acted with deliberate indifference when they chose to shoot and kill Kris.

83.    Their time for deliberation is demonstrated by the fact that none of Officers Barker, Boynton, Harvey, Norman, or Worland fired their weapons at Kris, despite witnessing the same events and conduct.

84.     Further demonstrating time for deliberation is the fact that, following this shooting, Officer Boynton said that he had his patrol rifle facing front and forward through the windshield in case Kris started firing his weapon. However, Officer Boynton did not fire his rifle. This shows that Officer Boynton was able to deliberate on whether or not to fire his weapon and chose not to – while pointing his weapon at Kris.

85.     Further demonstrating time for deliberation is the fact that, Officer Norman's body camera shows that when Kris came into his sight, Officer Norman began to back up while keeping his rifle pointed at Kris, but Officer Norman did not fire either weapon. This shows that Officer Norman was able to deliberate on whether or not to fire his weapon and chose not to – while pointing his weapon at Kris.

86.     Just as Officers Boynton and Norman had time to deliberate, so too did each of Defendants Jones, Ostolaza, Senoran, Stineman prior to making the decision to shoot and kill Kris.

87.     As such, each of Defendants Jones, Ostolaza, Senoran, Stineman acted with deliberate indifference in violation of Monte Handy and Ardell Handy's Fourteenth Amendment due process right to associate with their son, and I.H., a Minor, A.H., a Minor, and M.H, a Minor's Fourteenth Amendment due process right to associate with their father.

88.     Furthermore, each of Defendants Jones, Ostolaza, Senoran, Stineman acted with the purpose to harm and with no legitimate law enforcement purpose for shooting Kris, when they each shot and killed him despite Kris not presenting any threat, as his gun was pointing down toward the ground below him.

89.     In *Porter*, the Court noted that in both the Fourth and Fourteenth Amendment contexts "courts reviewing deadly force in response to a supposed public safety threat are presented with a 'factbound morass,' especially when on first glance an officer's use of deadly force appears

disproportionate to the nature of the threat." *S.T. by & through Niblett v. City of Ceres*, 327 F. Supp. 3d 1261, 1281 (E.D. Cal. 2018); *quoting Porter*, 546 F.3d at 1141.

90. Here, not only at first glance, but after each and every viewing of the body camera videos and dash camera video, it is clear that each of Defendants Jones, Ostolaza, Senoran, Stineman's "use of deadly force appears disproportionate to the nature of the threat." *Id.*

91. This was clear to Virginia Miller, a neighbor in the complex who watched the shooting unfold and believed the use of deadly force was unjustified, as she explained in a news interview that, "I never saw him raise the gun, I never saw him charge at the officers, and I never felt like any of us were in imminent danger until the officers started shooting toward our full apartment building."

92. The Court went on to indicate that when there was a "severe and sudden escalation of the situation: where [Decedent's] only violation was non-compliance, [officer's] extraordinary response was to fire five shots[,]" this may have satisfied the purpose to harm standard. *S.T. by & through Niblett*, 327 F. Supp. 3d at 1281; *quoting Porter*, 546 F.3d at 1141.

93. This is precisely what we have in this case, where each of Defendants Jones, Ostolaza, Senoran, Stineman acted with a severe and sudden escalation of the situation when Kris's only violation was non-compliance and each of Defendants Jones, Ostolaza, Senoran, Stineman's extraordinary response was to fire ten shots. *See id.*

94. Further, in this case, a final shot was fired by one of Defendants Jones, Ostolaza, Senoran, Stineman AFTER Kris was incapacitated and immobilized on the ground and had been shot nine other times.

95. This final shot – separate and apart from the initial barrage of bullets which were also unjustified and illegal – shows a clear intent to harm, as there is not even an argument that

there was a reason to fire anymore shots at Kris after he fell to the ground and the gun was no longer in his hand.

96.     Accordingly, not only did each of Defendants Jones, Ostolaza, Senoran, Stineman act with deliberate indifference when they shot and killed Kris, but they also acted with the intent to harm with no legitimate law enforcement purpose for shooting.

97.     Therefore, each of Defendants Jones, Ostolaza, Senoran, Stineman violated Monte Handy and Ardell Handy's Fourteenth Amendment due process right to associate with their son, and I.H., a Minor, A.H., a Minor, and M.H, a Minor's Fourteenth Amendment due process right to associate with their father, and are liable for damages.

**Count Three**

**<u>Wrongful Death Actions</u>**
**Pursuant to Alaska Stat. Ann. § 09.55.580**
**Against Defendants Jacob Jones, Jacob Ostolaza, Noel Senoran, and James Stineman**

98.     Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

99.     Monte Handy is Kris' father who depended on Kris.

100.    Ardell Handy is Kris' mother who depended on Kris.

101.    I.H., a Minor, is Kris' child who depended on Kris.

102.    A.H., a Minor, is Kris' child who depended on Kris.

103.    M.H, a Minor, is Kris' child who depended on Kris.

104.    Monte Handy is the personal representative of Kris' estate and brings this lawsuit on behalf of all surviving statutory beneficiaries, including but not limited to, Monte Handy, Ardell Handy, I.H., a Minor, A.H., a Minor, and M.H, a Minor, pursuant to Alaska Stat. Ann. § 09.55.580.

105. By reason of the wrongful conduct of fatally shooting Kris when Kris had not presented an immediate threat since his gun was dangling at his side and pointed directly down at the ground, each of Defendants Jones, Ostolaza, Senoran, and Stineman are liable for damages.

106. To recover on a wrongful death claim under 42 U.S.C. § 1983, a plaintiff who has standing must show both (1) the alleged constitutional deprivation required by 42 U.S.C. § 1983 and (2) the causal link between the defendant's unconstitutional acts or omissions and the death of the victim.

107. Each of Defendants Jones, Ostolaza, Senoran, and Stineman's excessive use of deadly force against Kris, as described herein, violated Kris' constitutional right under the Fourth Amendment and caused his death.

108. Each of Defendants Jones, Ostolaza, Senoran, and Stineman's conduct that caused Kris' death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and each of Defendants Jones, Ostolaza, Senoran, and Stineman are liable for their acts and infliction of emotional distress caused by the wrongful death of Kris Handy.

109. Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

**Count Four**

**<u>Survival Action</u>**
**Pursuant to Alaska Stat. Ann. § 09.55.570**
**Against Defendants Jacob Jones, Jacob Ostolaza, Noel Senoran, and James Stineman**

110. Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

111.    Plaintiff Monte Handy brings this claim as Personal Representative of the estate of Kristopher Handy, pursuant to Alaska Stat. Ann. § 09.55.570.

112.    Kris Handy died because of each of the Defendants' wrongful conduct.

113.    Kris Handy would have been entitled to bring this action against each of the Defendants if he had lived.

114.    The Decedent's right of action for wrongful conduct against the Defendants survives in favor of the estate of the deceased. Alaska Stat. Ann. § 09.55.570.

115.    Each of the Defendants are liable to the Estate of the deceased for the loss of Kris Handy's life, physical injury, pain and suffering, mental anguish, and the violation of his constitutional rights.

116.    Plaintiff seeks compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## V.
## PUNITIVE DAMAGES

117.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

118.    When viewed objectively from the standpoint of each of Defendants Jones, Ostolaza, Senoran, and Stineman, at the time of the occurrence, each of their wrongful conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

119.    As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by each of Defendants Jones, Ostolaza, Senoran, and Stineman, Plaintiffs are entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

# VI.
## DAMAGES

120.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

121.    Plaintiffs' injuries were a foreseeable event. Those injuries were directly and proximately caused by each of the Defendants' excessive deadly force used against Kris.

122.    As a result, Plaintiffs are entitled to recover all actual damages allowed by law. Plaintiffs contend each of Defendants Jones, Ostolaza, Senoran, and Stineman's conduct constitutes malice, evil intent, or reckless or callous indifference to Kris' constitutionally protected rights. Thus, Plaintiffs re entitled to punitive damages against Defendants Jones, Ostolaza, Senoran, and Stineman.

123.    As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiffs were forced to suffer all damages recoverable pursuant to Alaska Stat. Ann. § 09.55.580, including but not limited to the following:

a.  Actual damages;
b.  Pain and suffering and mental anguish suffered by Kris Handy prior to his death;
c.  Mental anguish and emotional distress suffered by all surviving statutory beneficiaries;
d.  Loss of companionship and society of Monte Handy and Ardell Handy's son.
e.  Loss of companionship and society of I.H., a Minor, A.H., a Minor, and M.H, a Minor's father.
f.  Loss of affection, consortium, comfort, financial assistance, protection, and care;
g.  Loss of prospective training and education;
h.  Loss of quality of life;
i.  Medical expenses;
j.  Funeral and burial expenses;
k.  Loss of assistance or services;
l.  Loss of earnings and contributions for support;
m.  Deprivation of the expectation of pecuniary benefits to the beneficiaries;
n.  Prejudgment interest; and
o.  Post judgment interest.

124.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs seek to recover, and hereby request the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

125.    If Plaintiffs prevail in this action, by settlement or otherwise, Plaintiffs are entitled to and hereby demand attorney's fees under 42 U.S.C. §1988.

## VIII.
## JURY REQUEST

126.    Plaintiffs respectfully request a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that judgment be rendered against each of the Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiffs further pray for all other relief, both legal and equitable, to which they are justly entitled.

**DATED** August 12, 2024.

James P. Roberts
Scott H. Palmer
Breanta Boss
**PALMER PERLSTEIN**

Benjamin L. Crump, Esq.
**Benjamin Crump Law, PLLC**

COUNSEL FOR PLAINTIFFS

By: /s/ James P. Roberts
Jamse P. Roberts, *Pro Hac Vice*